# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>ISAI JOSE SAAIB,<br><br>　　　　　　　　　　Defendant. | Case No.: 12-cr-1929-L<br><br>**ORDER:**<br><br>**(1) DENYING MOTION TO VACATE, SET ASIDE, or CORRECT SENTENCE UNDER 28 U.S.C. 2255, and**<br><br>**(2) DENYING CERTIFICATE OF APPEALABILITY, and**<br><br>**(3) DENYING REQUEST FOR COUNSEL** |

　　　Petitioner, Isai Jose Saaib ("Petitioner") filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. Respondent filed a Response and Opposition to the Motion, and Petitioner has filed a Reply. The Court has reviewed the record, the submissions of the parties, and the supporting exhibits. For the reasons set forth below, the Court **DENIES** Petitioner's Motion without prejudice.

//
//

## I. FACTUAL BACKGROUND

On April 20, 2012, Saaib entered the United States at the San Ysidro, California Port of Entry driving a Chrysler Sebring. (Indictment; Presentence Report at 3 [ECF NO. 65.]) Concealed within a non-factory compartment in the vehicle was Ariel Juarez-Garcia ("Juarez"), a citizen of Mexico who did not have permission to enter the United States. (*Id*.) Juarez was held as a material witness and on October 23, 2012, was deposed by the parties in a videotaped deposition. (Gov't Oppo Ex B at 4 [ECF NO. 102-1.])

On March 12, 2013, a jury trial began. Customs and Border Patrol ("CBP") Officer Robert Renner testified that he made contact with Petitioner at the pre-primary area of the Port of Entry ("POE") and observed that Petitioner appeared to be uncomfortable, shifting in his seat, switching his hands on the steering wheel and would look briefly at the officer, then look straight ahead. (Gov't Oppo Ex A at 55 [ECF NO. 102-1.]) Officer Renner stated that he asked Petitioner for his documents and asked him about the car. (Gov't Oppo Ex. B at 141-42 [ECF NO. 102-2)]. According to Officer Renner, Petitioner stated he bought the car six month before at an auction for $4,500. (*Id*. at 142.) Officer Renner asked Petitioner for his car keys, and then opened the trunk of the car, where he discovered that a wall had been constructed in the trunk area. (*Id*. at 143-45). He asked Petitioner if any work had been done to the vehicle, to which Petitioner responded "No." (*Id*. at 145).

CBP Officer Karla Chavez testified as the investigating officer for the prosecution. Officer Chavez stated that when she interviewed Saaib, he initially told her that he lived in Chula Vista, California, but as the interview progressed, he said he lived in Mexico and traveled to the United States to his place of employment. (*Id*. 190.) Officer Chavez testified that Saaib told her he purchased the Chrysler Sebring for $4,200 in cash from a person who advertised it on Auto Trader six months before his arrest, that he was the only person who used the vehicle, and that the car was in good condition. (*Id*. 193-94). When Officer Chavez asked Petitioner what he had done the night before the arrest, she

stated that Petitioner told her he went home, had dinner with his wife, mother-in-law, sister-in-law, went out for ice cream and went to bed early. (*Id*. at 194.) She testified that Saaib said he did not notice anything out of the ordinary when he got into his car the next morning. (*Id*. 196-97.)

TECS border crossing evidence and California Department of Motor Vehicle registration documents associated with Petitioner's three vehicles were introduced by Officer Chavez showing that Saaib had crossed the border numerous times, and that he was no more likely to drive one car than another. (*Id*. 201-10).

The defense presented four witnesses, and Saaib took the stand in his own defense. (*Id*. at 218, 234, 241, 285, 295). In his testimony, Saaib explained that he had purchased the Sebring for $2,500, from a seller on AutoTrader and that he traveled back and forth to work in the United States using the car. (*Id*. at 244). He stated that during his commute he saw the check engine light, in addition to a malfunctioning dashboard light, and so he took the car to a repair shop in Tijuana. (*Id*. at 244-45). Petitioner explained that he dropped the car off on Friday, April 13, 2012, and that he picked it up the following Monday. (*Id*. at 248-49). The car was still malfunctioning, according to Saaib so he returned it to the shop for more repairs. (*Id*. at 249). Saaib testified that after he dropped the car off, the repair shop told him the repairs could not be done there, and they would drop the car off at his house. (*Id*. at 249-50). Petitioner stated he gave the repair shop his address and that they delivered the car to his home later the same day. (*Id*. at 250). Saaib testified he has crossed the border thousands of times, and that he did not recall his hand shaking, as the Officers stated. (*Id*.)

On cross-examination Saaib said he denied having repairs done to the Sebring when speaking with Officer Chavez because he did not recall at that time. (*Id*. at 256). He claimed he did not recall telling Officer Renner that the car had no repairs done and denied that he told Officer Renner that he bought the Sebring from an auction for $4,500, instead stating he told the officer that he paid $2,500 for the car. (*Id*. at 257, 262-64). When asked whether he drove the Sebring more often than his Jeep Liberty to work, he

initially stated that he tried to drive the Sebring across the border more often than his other car, but after the prosecutor confronted him with his crossing history, he conceded that he drove the cars in equal measure. (*Id*. at 266-67).

In addition to Saaib's testimony, his coworker, Hector Salcedo testified that Saaib was honest and that his reputation was good with other workers. (*Id*. at 170). The defense investigator Alan Stevens testified about the location of the repair shop and the condition of Saaib's vehicle. (*Id*. at 180-82). Saaib's wife testified about his whereabouts the evening before his arrest, spoke about the location of the auto repair shop and stated that she helped him take the car to the repair shop on Friday the 13th of April. (*Id*. at 296).

Once the defense case rested, counsel began his closing argument by saying:

> On behalf of Mr. Saaib, he thanks you for serving on this jury. He had a story to tell, and he got a chance to tell it. It was his story. It wasn't the best story in the world. But it was his story.

(*Id*. at 283).

Defense counsel went on to state that Mr. Saaib did not know there was a person concealed in his car, that the material witness was a convicted felon and untrustworthy, Mr. Saaib would not risk his good job and solid family by transporting an illegal alien, and explained that the inconsistencies in Mr. Saaib's description of how much he paid for his car and whether he had recent repairs were innocent mistakes. (*Id*. at 283-286).

## II. PROCEDURAL BACKGROUND

On May 16, 2012, Petitioner was charged in a four count Indictment with the following charges: Count 1, bringing in illegal aliens for financial gain, in violation with 8 U.S.C. § 1324(a)(2)(b)(ii); Count 2, bringing in illegal aliens without presentation, in violation of 8 U.S.C. §1324(a)(2)(b)(iii); Count 3, aiding and assisting certain aliens to enter the United States and aiding and abetting, in violation of 8 U.S.C. § 1327 and 18 U.S.C. § 2. Count 4 charged Juarez with attempted reentry of a removed alien, in

violation of 8 U.S.C. § 1326(a) and (b). On August 20, 2012, the United States filed a material witness complaint against Juarez in criminal case 12MJ3104, and on August 23, 2012, Count 4 of the indictment was dismissed.

On March 15, 2013, the jury found Saaib guilty of Counts 1 and 2, and not guilty of Count 3. (Verdict [ECF NO. 51.]) Sentencing was held on June 24, 2013, at which time Saaib was sentenced to 36 months in custody as to Counts 1 and 2, to be served concurrently, and two years of supervised release as to each count, to run concurrent. (Rptr's Tr. 32-33 [ECF NO. 95.]

### III. DISCUSSION

### A. Ineffective Assistance of Trial Counsel

Petitioner argues that his Sixth Amendment rights to effective assistance of counsel were violated when his attorney stated during closing argument that Saaib's testimony was not a very good "story," essentially expressing his opinion that he did not believe Saaib. (Mot. 3-4). Saaib claims that counsel's failure to consult him about making the statement and the tactic of telling the jury not to believe his testimony were per se prejudicial under *United States v. Cronic*, 466 U.S. 648, 659 (1984). Should the Court find that *Strickland v. Washington*, 466 U.S. 668, 688 (1984) applies rather than *Cronic*, Petitioner contends there is no sound tactical reason for a defense lawyer to undermine his client's testimony during closing argument, and that due to counsel's deficient performance he can demonstrate he was prejudiced. (*Id*. 5). At the very least, Petitioner claims the Court should issue a certificate of appealability ("COA") and appoint counsel to represent Petitioner on appeal if the Court finds no merit to his ineffective assistance of counsel claim. (*Id*.)

The government responds that Petitioner exaggerates the impact of trial counsel's closing statement, when in fact, counsel argued that Petitioner's testimony was credible. (Oppo 15-16.) Rather than assailing Petitioner's veracity, counsel was employing a widely recognized strategy of conceding weaknesses in order to build credibility. (*Id*.) This was particularly important in this case where numerous inconsistencies existed in Petitioner's

version of events and the government's evidence. (*Id.*) Because trial counsel did not render ineffective assistance during his closing remarks, the government contends that Petitioner did not suffer prejudice, and his claim fails. (*Id.* 16-18).

To establish ineffective assistance of counsel, a petitioner must prove by a preponderance of the evidence that: (1) the assistance provided by counsel fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. To satisfy the deficiency prong of the *Strickland* test, the Petitioner must show that his counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." *Id*. at 687 (quoting in part *McMahan v. Richardson*, 397 U.S. 759, 771 (1970). In considering this issue, there is a "strong presumption that counsel's conduct falls within a wide range of professional assistance." *Strickland*, 466 U.S. at 689. Moreover, courts typically find that *post hoc* complaints about the strategy or tactics that defense counsel employed are insufficient to satisfy the first prong of *Strickland*. *See, e.g., United States v. Simmons*, 923 F.2d 934, 956 (2d. Cir. 1991) (holding that appellant's displeasure with strategy employed by trial counsel was insufficient to establish ineffectiveness).

An exception to the *Strickland* standard was announced in *Cronic,* where the Supreme Court acknowledged that certain circumstances are so egregiously prejudicial that ineffective assistance will be presumed. *Cronic*, 466 U.S. at 659 (1984). For example, where counsel is totally absent, is prevented from assisting the accused during a crucial stage in the proceeding, or fails to "subject the prosecution's case to meaningful adversarial testing" prejudice will be presumed. *Id*.

1. **Presumption of Prejudice**
    a. *Client consultation*

Saaib contends that he was entitled to be informed about important decisions related to his representation yet his trial counsel failed to consult with him about the decision to state his story was not a good one, which also denied him the opportunity to object. (Mot.

6

at 3). He claims the failure to consult results in a presumption of prejudice, citing *United States v. Thomas*, 417 F3d 1053, 1060 (9th Cir. 2005). (*Id*.). By failing to inform Saaib of his plan to make this concession, counsel also infringed Saaib's right to testify, as he may have chosen to remain silent if he knew counsel was going to state that his testimony was unbelievable. (*Id*. at 4.)

In *Thomas*, the Ninth Circuit considered whether defense counsel prejudiced his client by failing to consult with defendant before conceding defendant was guilty of a robbery charge in an attempt to avoid conviction on other charges for which there was less clear evidence. 417 F.3d at 1058. The Court approved of defense counsel's tactic of admitting his client's guilt of one crime in order to build credibility and held that counsel's "failure to consult and obtain consent in and of itself does not render [counsel's] strategic decision presumptively prejudicial." *Id*. at 1057-59. In their concurrence, upon which Saaib relies, Justices Fletcher and Fisher, commented that one of defense counsel's most basic responsibilities is to consult with the client about "important decisions relating to the representation" and that "an attorney should obtain his client's express consent to a strategy conceding guilt (or any essential element thereof) on any charge or charges." *Id*. at 1060. Petitioner claims that such consultation would certainly seem required before making concessions about the defendant's testimony.

*Thomas* is distinguishable from the present case because here counsel consulted with Saaib, as demonstrated by counsel's declaration, and that of the defense investigator. Petitioner's trial counsel, James Gleaves, stated he "consulted Mr. Saaib specifically on how [he] would deliver [his] closing argument." (Dec. James Gleaves, Gov't Oppo Ex. D at 3.) Counsel told Petitioner of the weaknesses of the case, including that he may need to concede that inconsistencies existed between the evidence presented at trial and Petitioner's testimony, to build credibility and buttress the defense case. (*Id.*) Gleaves also stated that multiple witnesses observed his consultation with Petitioner, including the defense investigator, Alan Stevens: Mr. Saiib's wife, Mariel Mendez; and Mr. Saaib's brother, Jacob Saaib, who attended most, if not all of the meetings counsel had with

Petitioner. (*Id*.at 2). In his declaration, defense investigator Alan Stevens, stated that trial counsel "went over each witnesses' trial testimony and discussed the defense closing argument" with Petitioner, his wife, and brother. (Dec. Alan Stevens, Gov't Oppo, Ex. E at 3).

Petitioner argues the Court should disregard the declarations by counsel and Stevens because the procedures set forth in *Bittaker v. Woodford*, 313 F.3d 715 (9th Cir. 2003) were not followed. In *Bittaker*, the petitioner asserted an ineffective assistance of counsel claim within a federal habeas petition. *Id*. at 717. The district court entered a protective order, limiting the use of protected attorney-client materials to the federal habeas case before the court, rather than allow them to be disseminated or used by the state to re-prosecute the petitioner. *Id*. It is not clear how the *Bittaker* procedures have been violated here. The declarations were executed in response to this section 2255 petition which asserted an ineffective assistance of counsel claim, not for purposes of other litigation, and did not become subject to a protective order. Moreover, the government did not violate Petitioner's attorney-client privilege by procuring and submitting the declaration of counsel, because Petitioner waived his privilege when he raised a claim of ineffective assistance of counsel. *Bittaker,* 331 F.3d at 722. Therefore, the declarations are properly before the Court. Because counsel consulted with Saaib about his closing argument strategy, he did not render deficient performance and prejudice is not presumed.

Petitioner contends he is entitled to an evidentiary hearing because it is disputed whether counsel explicitly told Petitioner he planned to say "his story was not the best in the world." (Reply 2). This Court must conduct an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Here, the motion and declarations demonstrate that Saaib was included in the discussion about defense counsel's closing argument strategy, and although counsel did not state that he told Petitioner that he would phrase the argument by saying it was "not the best story," this choice was a tactical decision well within counsel's discretion. *Yarborough v. Gentry*, 540 U.S. 1 (2003) ("counsel has wide latitude in deciding

8

how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage.") Accordingly, the Court finds no reason to hold an evidentiary hearing.

Petitioner further argues that if he had known trial counsel planned to cast doubt on his testimony, it would have discouraged him from taking the stand and exercising his right to testify. (Mot. at 4.) It is undisputed that a criminal defendant's right to testify is Constitutionally protected and is "essential to due process of law in a fair adversary process." *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987). However, Saaib has not pointed to any authority which suggests that a defendant's right can be violated when the client has been told counsel would need to admit the weaknesses in the case and then counsel proceeds to acknowledge those infirmities during closing argument. Instead, the jury heard Petitioner's account of the events, judged his credibility, and weighed the government's evidence against that testimony, as the Constitution provides. The Court finds no violation of Petitioner's right to testify.

### b. Counsel Performance

Prejudice can also be presumed, argues Saaib, because counsel told the jury not to believe his client by saying his story was not a very good one. (*Id*. at 5) Petitioner cites *United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991), in support, contending that the per se prejudice suffered in that case mirrors the prejudice he suffered here. (*Id*.)

In *Swanson*, the defendant was on trial for bank robbery and was represented by appointed counsel. *Id*. at 1071. During closing argument, counsel stated that because the evidence was overwhelming, he was not going to insult the jurors intelligence by trying to raise a reasonable doubt about whether the defendant had committed the robbery or whether intimidation had been proven. *Id*. However, these were the only factual issues in dispute on the only count that was charged. *Id*. The Ninth Circuit held that appointed counsel failed to hold the government to the burden of proving beyond a reasonable doubt that defendant committed the crimes, and as a result, defendant was deprived of due

process. *Id*. 1073. Defense counsel's "statements conveyed to the jury his belief that his client was guilty." *Id*. 1074. The Court distinguished between an attorney's tactical decision to admit certain facts as a way to direct the jury's attention elsewhere, and situations where an attorney fails to act as defense counsel by telling a jury there is no reasonable doubt that his client is guilty. *Id*. 1075-76. The Court found that the latter represented a complete breakdown in the adversarial process, warranting the presumption of prejudice. *Id*.

Petitioner's claim that his trial attorney essentially did the same thing as defense counsel in *Swanson* misses the mark. As a primary matter, the Court does not agree with Petitioner's characterization of defense counsel's statement. Rather than giving his opinion that he did not believe his client, counsel was attempting to acknowledge skepticism that might arise due to the very real discrepancies between the government's evidence and Saaib's testimony. In fact, counsel stated in his declaration:

> In my opinion, the jury could easily determine that the evidence presented at trial contradicted Mr. Saaib's testimony. Therefore, to build credibility and more persuasively argue that the Government did not prove its case beyond a reasonable doubt, I conceded that Mr. Saaib's testimony was not the best story in the world. Mr. Saaib was apprised of the weakness of his case prior to closing argument and the need to take measures to buttress the defense case.

(Dec. Alan Stevens, Gov't Oppo. Ex. E at 3).

In addition, counsel's closing remarks are distinguishable from *Swanson*, where counsel virtually conceded there was no reasonable doubt that defendant committed the crime, thereby abandoning his duty to his client, because it does not present a breakdown in the adversarial process at trial. Instead, defense counsel held the government to its burden of establishing Petitioner's guilt beyond a reasonable doubt during trial and closing. Counsel included Petitioner and his family in all phases of trial preparation, and the defense called witnesses, in addition to presenting Petitioner's testimony. Moreover, counsel stated during closing that Petitioner's testimony was credible, that he "told the truth", and that rather than being intentionally misleading, Petitioner simply was not precise during his

testimony. (Rptr's Tr. Govt's Ex B at 287 (Mar. 13, 2013) [ECF NO 102-2]). Accordingly, prejudice cannot be presumed from counsel's performance, and *Strickland*, rather than *Cronic* or *Swanson*, applies.

### 2. *Strickland*

The *Strickland* test, requiring a showing of prejudice caused by counsel's ineffectiveness, is applicable (1) in cases where the record reflects that an attorney's errors or omissions occurred during an inept attempt to present a defense, or (2) that he or she engaged in an unsuccessful tactical maneuver that was intended to assist the defendant in obtaining a favorable ruling. *Swanson*, 943 F.2d at 1073. Counsel's poor tactical decisions only amount to ineffective assistance when the defendant can produce enough evidence to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "The right to effective assistance extends to closing arguments." *Yarborough*, 540 U.S. at 6.

#### a. *Deficient performance*

Petitioner contends that there can be no sound tactical decision for an attorney to undermine his client's testimony during closing argument, particularly where the testimony "constitutes the entire defense." (Mot. 5-6). This is not a case of counsel conceding weaknesses in order to build credibility, but instead, Petitioner argues his attorney conceded away his entire defense. (*Id.*) Moreover, Saaib claims that trial counsel's closing argument was "schizophrenic" because it consisted of him telling the jury that Petitioner's story did not sound believable, but then arguing that Petitioner was telling the truth. (*Id*. at 6).

The government counters that Petitioner's testimony was "so radically different from that of the Government's witnesses that it required trial counsel to basically concede that his testimony left certain questions unanswered" to preserve counsel's credibility with the jurors. (Oppo. 17.) The government concludes that the statement that

Petitioner's testimony was "not the best story in the world" falls within the exercise of reasonable professional judgment. (*Id*. 18).

During the government's closing remarks, the prosecutor began by summarizing the testimony of each of its witnesses, pointing to the inconsistencies between Petitioner's statements to officers and his testimony. (Rptr's Tr., Govt's Ex B at 264-280 (Mar. 13, 2013) [ECF NO. 102-2.]) To conclude his remarks, the prosecutor noted that "the Defendant's story appears to rely on the premise that somebody would secrete a person into a vehicle with the hopes that the Defendant would drive into the United States and that they would somehow be able to meet the Defendant inside the United States and collect up that person." (*Id*. at 280). According to the government, "[t]he story just doesn't make sense." (*Id*. at 280-81).

Defense counsel seized upon the government's use of the word "story" which carried the connotation that his client was fabricating his version of the events. He attempted to lessen the impact of the word by reframing it in his own remarks by stating that his client "had a story to tell, and he got a chance to tell it. It was his story. It wasn't the best story in the world. But it was his story." (*Id*. at 283). He immediately followed these remarks by stating that the "only question is whether or not the prosecutor has convinced you beyond a reasonable doubt that Mr. Saaib knew there was somebody in that car. He didn't know there was somebody in that car. He's not guilty of any of these crimes." (*Id*. at 283-84). Counsel pointed to the fact that Petitioner was a well-educated man, with a good job, and a family, so it was hard to believe he would risk losing all of that to commit this crime. (*Id*. 285). Defense counsel addressed the inconsistencies between Petitioner's statements to officers at the border and his testimony, noting that when a person is waiting at the border attempting to get to work, the answers he or she gives might be given in haste and may be innocent mistakes rather than intentionally misleading, particularly about something like the price paid for a vehicle. (*Id*. at 286)  In conclusion, trial counsel stated that his client told the truth. (*Id*. at 287).

In light of the fact that there were numerous inconsistencies between the government's evidence and Petitioner's testimony, counsel made a sound strategic decision to mirror the prosecutor's use of the word "story" to gain credibility, state that Petitioner was telling the truth, and then illustrate that the government had not met its burden to prove Petitioner's guilt beyond a reasonable doubt. *See Yarborough*, 540 U.S. at 9 (2003) ("[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case.") Whether defense counsel's choice is successful is not the benchmark for determining effective assistance of counsel. *Strickland*, 466 U.S. at 689. Instead, it must appear that counsel's choice was objectively reasonable under prevailing professional norms and considering the circumstances. *Id* at 690. Here, counsel's use of a well-tried tactic was objectively reasonable.

Petitioner claims that pursing a litigation tactic that cannot work is distinguishable from devising a litigation strategy that fails, arguing that here defense counsel's tactic could not succeed. Saaib cites *Griffin v. Harrington*, 7527 F.3d 940, 946 (9th Cir. 2013), in support, yet the Court in *Griffin* found counsel ineffective because he devised a tactic that not only could not work, but resulted in permanently depriving his client of the one chance he had to "render inadmissible the prosecutions' only direct evidence linking him to the murder with which he [was] charged." *Id.* at 946. Unlike counsel in *Griffin*, Saaib's attorney chose a well-recognized strategy to build credibility, and did not preclude success by stating that his story was not the best. Because Petitioner has not demonstrated that his attorney rendered deficient performance, he has failed to meet the first of the two required prongs of *Strickland*, and his claim fails.

**B.     CERTIFICATE OF APPEALABILITY**

A certificate of appealability is authorized "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this standard, Petitioner must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Petitioner does not have to show "that he should prevail on the merits. He has already failed in that endeavor." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (internal quotation omitted).

Petitioner claims that this Court should issue a COA because the Court previously stated that it "may be wrong" and that Petitioner might have a "good shot" on appeal. (Mot. 9). He also requests that the Court appoint him counsel on appeal. (*Id*.) Having reviewed the matter, the Court finds that Petitioner has not made a substantial showing that he was denied a constitutional right and the Court is not persuaded that jurists could disagree with the Court's resolution of his claims or that the issues presented deserve encouragement to proceed further. Therefore, a certificate of appealability is **DENIED** and Petitioner's request for appointment of counsel on appeal is **DENIED**.

## II. CONCLUSION

For the foregoing reasons, Petitioner's Motion under section 2255 is **DENIED** without prejudice. Further, the Court **DENIES** a certificate of appealability and request for appointment of counsel is **DENIED**.

**IT IS SO ORDERED**

Dated: December 20, 2017

*/s/ M. James Lorenz*
Hon. M. James Lorenz
United States District Judge